**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SIMON SOLOMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-6144 |
| | ) | |
| THE COOK COUNTY BOARD OF | ) | Judge Robert M. Dow, Jr. |
| COMMISSIONERS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

For the reasons set forth below, the Court grants in part and denies in part Plaintiff's motion for summary judgment [100] and grants in part and denies in part the cross-motions of the County Defendants [105] and Intervenor-Defendant [103]. Specifically, Plaintiff's motion is granted as to Count I and denied as to Counts II and III, and the cross-motions of the County Defendants [105] and Intervenor-Defendant [103] are denied as to Count I and granted as to Counts II and III. As a consequence of its ruling in Plaintiff's favor on Count I, the Court finds the firearms regulations at issue to be unconstitutionally overbroad. Nevertheless, the Court temporarily stays enforcement of its ruling for six months—*i.e.*, until March 15, 2022—to provide the General Assembly an opportunity to act definitively on this matter if it chooses to do so.

I. **Background**

Plaintiff Simon Solomon challenges a state law and a forest preserve ordinance that prevent concealed carry license holders from carrying concealed weapons in the Forest Preserve District of Cook County. He alleges that the statute and the ordinance violate the Second Amendment of the United States Constitution, as well as the Due Process and Equal Protection Clauses of the

Fourteenth Amendment. He sued various Cook County entities and officials, who, along with Intervenor-Defendant the State of Illinois, vigorously defend the statute and the ordinance on the grounds that the entire Forest Preserve District is a "sensitive place" on which firearms regulations are presumptively lawful, and that the regulations pass intermediate scrutiny because they are substantially related to public safety. The factual and procedural background of the case is as follows.

A.     **Stipulated Facts**[1]

1.     **Plaintiff Simon Solomon**

Plaintiff Simon Solomon is 63 years old and a resident of Cook County. [94 at ¶ 66[A].][2] For the past 25 years, Plaintiff has owned and operated a carpet cleaning business. [*Id.* at ¶ [67[A].] Plaintiff has never served in the military, worked in law enforcement, or worked in any unit of government, nor has he ever worked for the Forest Preserve District of Cook County or had employment within a forest preserve. [*Id.* at ¶¶ 68[A], 69[A].] Plaintiff is also a firearm owner and obtained his Illinois concealed carry license ("CCL") approximately five years ago. [*Id.* at ¶ 70[A].] The process included completing a paper application and attending a 16-hour, two-day class. *Id.* [*Id.* at ¶ 70[A].]

Plaintiff has been visiting properties owned by the Forest Preserve District of Cook County ("FPDCC" or the "Forest Preserve") for about forty years. [*Id.* at ¶ 71.] In addition to FPDCC property, Plaintiff also visits forest preserve properties within DuPage County and Kane County. [*Id.* at ¶ 84.] He spends "99 percent" of his time on FPDCC property fishing. [*Id.* at ¶ 72.] In the

---

[1] In lieu of separate Local Rule 56.1 statements, the parties helpfully submitted a joint set of stipulated facts [94].

[2] The joint stipulation of facts [94] contains two paragraphs labeled "66," and the same is true for paragraphs 67-70. To distinguish them, the Court marks the second of each of these pairs with an "[A]."

summertime, Plaintiff drives to the Skokie Lagoons and fishes at the same spot every night on his way home from work. [*Id.* at ¶¶ 73, 74.] The Skokie Lagoons are FPDCC property, which Plaintiff knows, and consist of seven lagoons connected by channels on the Skokie River. [*Id.* at ¶ 75.] The property closes each night at sunset, which Plaintiff also knows. [*Id.* at ¶ 77.]

On April 30, 2015, Plaintiff stopped at his usual fishing location within the Skokie Lagoons on his way home from work. [*Id.* at ¶ 79.] As Plaintiff was finishing his fishing for the night, he was approached by a FPDCC police officer for being on FPDCC property after sunset. [*Id.* at ¶ 80.] The FPDCC officer discovered that Plaintiff was carrying a weapon in violation of FPDCC Ordinance 3-3-6 (discussed below) and arrested him. [*Id.* at ¶ 81.] The FPDCC confiscated two firearms from Plaintiff: a 45 caliber Colt Semi Auto handgun and a North America Arms 22 caliber Derringer. [*Id.* at ¶ 82.] Plaintiff has never been assaulted, attacked, or threatened on FPDCC property. [*Id.* at ¶ 83.]

### 2. General Facts about the Forest Preserve District of Cook County

The Forest Preserve District of Cook County was created more than a hundred years ago for the purpose of "protecting and preserving the flora, fauna, and scenic beauties within such district, and to restore, restock, protect and preserve the natural forests and such lands . . . in their natural state and condition, for the purpose of the education, pleasure, and recreation of the public. . . ." 70 ILCS 810/7; [94 at ¶ 6.] The Forest Preserve District contains roughly 70,000 acres throughout Cook County and owns 3,538 acres of land within Chicago city limits. [*Id.* at ¶¶ 8, 10.]

The FPDCC estimates that it receives approximately 62 million visits by county residents annually. [*Id.* at ¶ 7.]

### 3. FPDCC Features

The FPDCC features many family-friendly attractions, including the Brookfield Zoo and the Chicago Botanic Garden, which together host nearly three million visitors annually. [*Id.* at ¶ 11.] Brookfield Zoo estimates that it received 1,909,187 visitors in 2018, including 1,188 children at its Zoo Camp and 1,644 adults and children in its family play programs. [*Id.* at ¶¶ 12,13.] Zoo Camp is offered in the summer to children ages four to fourteen at Brookfield Zoo. [*Id.* at ¶ 13.] The Botanic Garden hosted more than one million visitors in 2018, including 25,000 students through guided field trips. [*Id.* at ¶ 14.] The FPDCC also contains four snowmobile areas and eight designated sledding hills [*id.* at ¶ 15]; three aquatic centers and eleven boat launch areas [*id.* at ¶ 16]; and five campgrounds and almost 300 picnic groves [*id.* at ¶ 17].

As noted above, one purpose of the FPDCC is to protect and preserve natural forests and land, together with their flora and fauna, "as nearly as may be, in their natural state and condition, for the purpose of the education, pleasure, and recreation of the public." 70 ILCS 810/7; [94 at ¶ 19.] To this end, the FPDCC features six Nature Centers, which provide educational programming about FPDCC flora and fauna to pre-K through 12th grade students. The Nature Centers are also designed for service-learning projects and nature play. [*Id.* at ¶ 20.] The total number of people served at Nature Centers was 485,630 in 2017 and 449,273 in 2018. [*Id.* at ¶ 21.] The FPDCC Nature Centers hosted 866 school programs in 2017 and 771 school programs in 2018. [*Id.* at ¶ 22.]

### 4. FPDCC Permits, Events & Volunteer Programming

The FPDCC requires permits for multiple activities on its property, including camping, facility rentals, large group picnics, and organized athletic events. [*Id.* at ¶ 23.] In 2018, the

FPDCC issued 7,398 picnic and event permits, including athletic permits, for events on FPDCC property. [*Id.* at ¶ 24.] (This total does not include permits given out by the FPDCC for volunteer events.) In total, 788,745 individuals attended the 7,398 permitted non-volunteer events in 2018. [*Id.* at ¶ 25.] Separately, there were 31 and 29 athletic leagues registered to use FPDCC facilities in 2017 and 2018, respectively. [*Id.* at ¶ 26.] The majority of these athletic leagues are for persons under the age of 18, including high school athletic programs and various youth leagues. [*Id.* at ¶ 27.] Each of the hundreds of events hosted at an FPDCC site by athletic leagues in 2017 and 2018 ranged in attendance from 20 to 100 people. [*Id.* at ¶ 28.]

Additionally, the FPDCC provided over 100 education groups with permits to facilitate their own education programming at various FPDCC sites outside of the Nature Centers in 2018. [*Id.* at ¶ 29.] Of the 107 education groups that received FPDCC permits in 2018, 95 groups included youths or teens or both, while twelve groups conducted educational programming for college-aged adults. Of those 95 groups, 89 included only youths or teens, two included teens and adults, and four included people of all ages. [*Id.* at ¶ 30.] In total, the FPDCC hosted education programming for 7,894 youths and teens in 2018. [*Id.* at ¶ 31.]

In 2018, the FPDCC held 58 Litter Cleanup Volunteer Workdays, during which school, youth, and community groups, facilitated by the FPDCC, cleaned up a grove, river, lake, or trail on FPDCC property. [*Id.* at ¶ 32.] In 2018, 1,978 people participated in the Litter Cleanup Volunteer Program. The FPDCC estimates that 1,780 of these individuals were youth participants. [*Id.* at ¶ 33.] The FPDCC also runs an Ecological Stewardship Program, through which Ecological Stewardship volunteers help increase native biodiversity and protect threatened plant and wildlife habitats on FPDCC property. [*Id.* at ¶ 34.] In 2018, the FPDCC estimates that 2,106 youth participated in the Ecological Stewardship Program. [*Id.* at ¶ 35.] The number of youths that

participated in the FPDCC-affiliated youth Mighty Acorns (MA) and Citizen Scientists (CS) programs totaled 8,015 in 2017 and 10,045 in 2018. [*Id.* at ¶ 36.]

### 5.    FPDCC Signage Standards

The FPDCC Sign Manual & Standards ("the Manual") outlines FPDCC protocol as to where and how signs should be placed on FPDCC property, as well as what information signs should communicate.  The FPDCC updates signage on its properties, as needed, in accordance with the Manual's standards.  The FPDCC's updates depend, for example, on its budgetary constraints. [*Id.* at ¶ 37.]  The Manual outlines the FPDCC "Zone Concept," which sorts FPDCC property into zones to differentiate how visitors engage with signs at all phases of their visit to an FPDCC property.  The different zones include the: (1) Identification Zone; (2) Entry Zone; (3) Orientation Zone; (4) Trail Signs; (5) Buildings and Facilities Signs; and (6) Special Area Signs. [*Id.* at ¶ 38.]  The Identification Zones include areas along roads and property lines that are typically experienced from a vehicle. [*Id.* at ¶ 39.]  Signs within this zone are intended to identify FPDCC property and include signs marking the property boundaries and entrances to FPDCC sites.

- The Entry Zone includes the areas along the entry drive of an FPDCC property typically before the first parking stall. [*Id.* at ¶40.]  Visitors typically see Entry Zone signs from a vehicle. *Id*. Signs within this zone are intended to provide the specific name of an FPDCC grove or preserve and welcome visitors. *Id*.

- The Orientation Zone includes the area along FPDCC property parking lots that is typically experienced by pedestrians. [*Id.* at ¶ 41.]  Signs in the Orientation Zone are located in the most accessible and visible point in the preserve and communicate opportunities within the

FPDCC property, such as off-leash dog areas or sledding hills, as well as rules, regulations, special events, and telephone numbers for emergencies. *Id*.

- Trail Signs are placed along FPDCC trails to assist with wayfinding and are typically read by pedestrians or from a bicycle or horse. Trail Signs regulate pedestrian, bicycle, and horse use and provide trail information, including the beginning of the trail, trail mile markers, and directions and information about other destinations available from the trail. [*Id.* at ¶ 42.]

- Buildings and Facilities Signs identify both public and non-public buildings and facilities on FPDCC property, including Nature Centers, Visitor Centers, and Special Event Pavilions. [*Id.* at ¶ 43.]

- Special Area Signs are reserved for restoration projects, recreation areas, and other unique sites to convey information about regulatory messages, educational or interpretative messages, partner recognition, grant recognition, or other temporary messages relating to programs or events. [*Id.* at ¶ 44.]

- Special Area Signage, Entry Zones, and Orientation Zones all contain Regulatory Signs. Regulatory Signs provide control of pedestrian and vehicular traffic, including signs regulating vehicle speed, parking, and swimming, as well as signs prohibiting firearm use. [*Id.* at ¶ 45.]

The Manual also contains detailed standards for each type of FPDCC sign, including the sign's dimensions and how it should be mounted. [*Id.* at ¶ 46.] The Manual's "Typical Zone Areas

for Signs" graphic presents a true and correct example map of the different signage zones within a typical FPDCC property. [*Id.* at ¶ 47.]

### 6. FPDCC Hunting Restrictions

The FPDCC prohibits the hunting of all birds, animals, and animal habitats on FPDCC property without authorization. (FPDCC Code Sections 2-2-3 and 3-3-17) [*Id.* at ¶ 48.] The FPDCC maintains a contract with the United States Department of Agriculture (USDA) Animal and Plant Health Inspection Services (APHIS) Wildlife Services (WS) to continue ongoing integrated wildlife management services related to the White-tailed Deer Management Program. [*Id.* at ¶ 49.] As part of this contract, the FPDCC considers APHIS WS to be an "invitee" on its lands. Pursuant to the contract, the FPDCC is required to "exercise reasonable care to warn APHIS WS as to dangerous conditions or activities" on FPDCC property. [*Id.* at ¶ 50.]

### 7. Ordinance Violations in the Forest Preserve District of Cook County

The Illinois Firearm Concealed Carry Act (the "Act") expressly prohibits concealed carry of a firearm on or into any real property under the control of the Cook County Forest Preserve District. 430 ILCS 66/65(a)(14) ("Section 65(a)(14)"). The Illinois General Assembly did not extend this prohibition to any other county forest preserve district in the state. *Id*; [94 at ¶ 51.] Section 65(a)(14) provides that "[a]ny licensee prohibited from carrying a concealed firearm into the parking area of a prohibited location" such as FPDCC property may nevertheless carry a concealed firearm into the parking area as long as he or she "store[s the] firearm or ammunition concealed in a case within a locked vehicle or locked container out of plain view within the vehicle in the parking area." 430 ILCS 66/65(b); [94 at ¶ 52.]

FPDCC Ordinance 3-3-6 prohibits concealed carry licensed holders from knowingly carrying a firearm on or into FPDCC property. [*Id.* at ¶ 53.] Between July 13, 2011 and August

31, 2018, there were 16,741 violations of various ordinances within the FPDCC. [*Id.* at ¶ 54.] 226 of those violations are categorized as weapons violations:

      a. Sixteen (16) violations of code 2-2-3(C): "Hunting devices";

      b. Six (6) violations of code 3-3-1(A)(8): "Carry knife, switchblade, ballistic knife";

      c. Forty-three (43) violations of code 3-3-6: "Weapons";

      d. Sixteen (16) violations of code 3-3-6(A): "Firearms possession";

      e. Fourteen (14) violations of code 3-3-6(B): "Concealed weapons"; and

      f. 174 violations of code 3-3-6(C): "Discharging toy firearms."

[*Id.* at ¶ 55.]

Between January 1, 2018 and December 31, 2018, there were six (6) violations of FPDCC code 3-3-6(A): "Firearms Possession," which specifically involved possession of firearms and were adjudicated by administrative hearings; two (2) violations of FPDCC code 3-3-6 (B): "Concealed Weapons," which specifically involved the carry, wear or conceal of a deadly weapon and were adjudicated by administrative hearings; and four (4) violations of FPDCC code 3-3-6: "Weapons," which specifically involved possession of a rifle and were adjudicated by administrative hearings. [*Id.* at ¶ 56.] In 2018, there were fifteen incidents of major crimes in the FPDCC. [*Id.* at ¶ 57.] Of the fifteen major crime incidents, three incidents involved a weapon.[3] [*Id.* at ¶ 58.]

FPDCC law enforcement officers are deployed to patrol FPDCC property on three shifts each day. In addition to traditional patrols in marked police vehicles, FPDCC officers conduct high-visibility patrols in the preserves, on and off the trails, on foot, bicycle, boat, ATV, and

---

[3] The record does not state whether the weapons were firearms, or whether they were lawfully-owned concealed firearms.

through other methods. [*Id.* at ¶ 59.] In 2018, the FPDCC's budget included 125 full-time equivalent law enforcement officers. [*Id.* at ¶ 60.]

### 8. Gun Violence in Cook County and Chicago City Limits

The Illinois State Police and Chicago Police Department each collect and manage criminal data. Specifically, the Chicago Police Department aggregates data regarding crime in Chicago and selected operations of the Chicago Police Department. (Chicago Police Department: Publicly Accessible Data, https://home.chicagopolice.org/statistics-data/data-requests/ (last visited September 10, 2021)). Pursuant to the Uniform Crime Reporting Act, the Illinois State Police serves as a central repository and custodian of crime statistics for the State and aggregates data from across county and municipal law enforcement agencies. 50 ILCS 709/5-10; [94 at ¶ 61.] According to the Illinois State Police, between 2014 and 2019, there were 257 violations of the Illinois Concealed Carry Act ("the Act"), where persons carried concealed weapons into a prohibited area outlined in 430 ILCS 66/65(A). [*Id.* at ¶ 62.] Of those 257 violations, 47 involved incidents of person carrying concealed weapons on playgrounds, park facilities, the FPDCC, public libraries, preschools, and elementary school property. Specifically, there were four incidents or persons violating the Act by carrying concealed weapons on FPDCC Property. [*Id.* at ¶ 63.]

According to the Illinois State Police, between January 2, 2016 and May 29, 2019, there were 154 victims, age seventeen and under, of first- and second-degree murder in Cook County, Illinois. [*Id.* at ¶ 64.] Of the 154 juvenile victims in Cook County, five victims were one-year old. [*Id.* at ¶ 65.] All but twelve of the 154 juvenile homicide incidents involved firearms. [*Id.* at ¶ 66.]

According to the Chicago Police Department, between 2010 and 2018, 170,876 juveniles were victims of property crimes and violent crimes in the City of Chicago. [*Id.* at ¶ 67.] Of those juveniles, 3,672 were shooting victims, and 427 died. [*Id.* at ¶ 69.] Between January 1, 2019 and

August 28, 2019, 10,844 children were victims of violent and property crimes in the City of Chicago, including 181 juvenile shooting victims, of whom 22 died. [*Id.* at ¶¶ 68, 70.]

9. **General Facts about the Forest Preserve District of Kane County**

Kane County, Illinois has a population of approximately 534,216 people and covers 520.06 square miles. [*Id.* at ¶ 86.] The Forest Preserve District of Kane County ("FPDKC") was organized in 1925 by public referendum. The Kane County Forest Preserve District owns more than 94 properties and spans over 20,000 acres throughout Kane County, Illinois. [*Id.* at ¶ 85.] The FPDKC requires permits for multiple activities including camping, fishing, picnicking in groups of more than 25 people, and boating. [*Id.* at ¶ 87.] The FPDKC does not permit alcohol, motorized vehicles (*i.e.*, ATVs and dirt bikes), gambling, pyrotechnics, or swimming. Fishing is permitted only in designated areas and requires a proper Illinois State Fishing License. Hunting is prohibited outside of the FPDKC's deer-management program. [*Id.* at ¶ 88.]

10. **Criminal and Firearm Activity in Forest Preserve District of Kane County**

The FPDKC had one felony arrest between 2015 and 2019, and three arrests in which a person possessed a firearm. [*Id.* at ¶¶ 89, 90.] Four firearms were discharged, recovered, or found within the FPDKC between 2015 and 2019. [*Id.* at ¶ 91.] The FPDCK also had one assault with a firearm and six suicides with firearms in that period. [*Id.* at ¶¶ 93, 92.]

11. **General Facts about the Forest Preserve District of DuPage County**

DuPage County has a population of approximately 928,589 people and covers 327.50 square miles. [*Id.* at ¶ 96.] The Forest Preserve District of DuPage County ("FPDDC") consists of 60 forest preserves, 166 miles of trails, 31 lakes and ponds, and 47 miles of rivers and streams. It spans roughly of 26,000 acres of land in DuPage County and receives approximately 4 million visitors annually. [*Id.* at ¶¶ 94, 95.] The FPDDC requires permits for multiple activities on its

11

property, including archery, flying model aircraft, taking a dog off-leash, boating, youth group camping, and photography. [*Id.* at ¶ 97.] It does not allow alcohol, paintball guns, air rifles, pyrotechnics (*i.e.*, fireworks and rockets), motorized vehicles off-road, hunting, trapping or collecting wildlife and removing any natural resource from the preserves, ground fires in picnic areas, and feeding wildlife. [*Id.* at ¶ 98.]

### 12. Criminal and Firearm Activity in Forest Preserve District of DuPage County

There were 208 felony and misdemeanor arrests within the FPDDC between 2015 and 2019. [*Id.* at ¶ 99.] Six of those arrests involved a person carrying a firearm. [*Id.* at ¶ 100.] During that period, the FPDDC also experienced twelve incidents in which firearms were discharged, recovered, or found within the district, and eight suicides with firearms. [*Id.* at ¶ 102.]

### 13. General Facts about the Forest Preserve District of Will County

Will County, Illinois has a population of approximately 692,310 people and covers 836.91 square miles. [*Id.* at ¶ 104.] The Forest Preserve District of Will County ("FPDWC") consists of 82 forest preserves and spans roughly of 22,000 acres of land in Will County. [*Id.* at ¶ 103.] The FPDWC requires permits for multiple activities on its property, including boating, camping, allowing dogs off-leash, picnicking in groups larger than 25 people, geocaching, metal detecting, and for-profit photography, and it does not allow swimming outside of designated areas, hunting, gambling, or pyrotechnics. [*Id.* at ¶¶ 105, 106.]

### 14. Criminal and Firearm Activity in Forest Preserve District of Will County

There were four felony arrests within the FPDWC between 2015 and 2019, and five arrests in which a person possessed a firearm within the FPDWC. [*Id.* at ¶¶ 107, 108.] During that period

the district experienced eight incidents in which firearms were discharged, recovered, or found, two assaults with firearms, and one suicide with a firearm. [*Id.* at ¶¶ 109-11.]

15. **General Facts about the Forest Preserve District of Lake County**

Lake County, Illinois has a population of approximately 700,832 people and covers 443.67 square miles. [*Id.* at ¶ 113.] The Forest Preserve District of Lake County ("FPDLC") consists of 63 forest preserves and facilities and spans roughly of 31,100 acres of land in Lake County. [*Id.* at ¶ 112.] The FPDLC requires permits for multiple activities on its property, including allowing dogs off-leash, dog sledding, horseback riding, using horse carts and sleighs, boating, conducting organized sports, camping, use of a hot air balloon, airplane, glider, hang glider, or parachute, model aircraft flying, picnicking in groups larger than 25 people, and for-profit photography. [*Id.* at ¶ 114.] The FPDLC does not allow hunting, gambling, or igniting fireworks or other pyrotechnics. [*Id.* at ¶ 115.]

16. **Criminal and Firearm Activity in Forest Preserve District of Lake County**

There was one felony arrest within the FPDLC between 2015 and 2019 and two arrests in which a person possessed a firearm. [*Id.* at ¶¶ 16, 117.] During that period, the FPDLC experienced three incidents in which a firearm was discharged, recovered, or found, and one suicide with a firearm. [*Id.* at ¶¶ 118, 119.]

17. **General Facts about the McHenry County Conservation District**

McHenry County, Illinois covers 603.17 square miles. [*Id.* at ¶ 122.] The McHenry County Conservation District ("MHCCD") was organized in 1971 by public referendum. [*Id.* at ¶ 120.] The MHCCD owns more than 35 properties and spans 25,598 acres throughout McHenry County, Illinois. [*Id.* at ¶ 121.] MHCCD requires permits for multiple activities on its property, including camping, picnicking in groups of sixteen or more, special school sporting events, stargazing,

hunting, and for-profit photography. [*Id.* at ¶ 123.] The MHCCD does not allow hunting outside of designated areas or of animals that are not deer or waterfowl, fishing outside of designated areas or with a bow and arrow, swimming or boating outside of designated areas, gambling, paintball guns, or igniting fireworks or other pyrotechnics. [*Id.* at ¶ 124.]

### 18. Criminal and Firearm Activity in the McHenry County Conservation District

There were two firearms found within the MHCCD between 2015 and 2019. [*Id.* at ¶ 125.] Additionally, in that period there were fourteen unconfirmed reports of shots fired within the MHCCD and five complaints of firearms being discharged within the MHCCD, which were unfounded either by reason of individuals having valid hunting permits or the individual using a firearm in a safe manner outside of the MHCCD. [*Id.* at ¶ 126.] The district experienced one confirmed suicide and one apparent suicide with a firearm during that time. [*Id.* at ¶ 127.]

### B. Procedural History

On August 24, 2017, Plaintiff filed this suit against the following Defendants: Cook County Board of Commissioners Frank J. Aguilar, Alma E. Anaya, Luis Arroyo Jr., Scott R. Britton, John P. Daley, Dennis Deer, Bridget Degnen, Bridget Gainer, Brandon Johnson, Bill Lowry, Donna Miller, Stanley Moore, Sean M. Morrison, Kevin B. Morrison, Peter N. Silvestri, Deborah Sims, and Larry Suffredin[4]; Thomas Dart, Sheriff of Cook County, in his official capacity as Sheriff of Cook County and Kimberly M. Foxx, in her official capacity as State's Attorney of Cook County,

---

[4] As of December 4, 2018, Cook County Commissioners Frank J. Aguilar, Kevin B. Morrison, Donna Miller, Bill Lowry, Brandon Johnson, Bridget Degnan, Scott R. Britton, and Alma E. Anaya replaced Commissioners Jerry Butler, Gregg Goslin, Timothy O. Schneider, Richard Boykin, John Fritchey, Jesus G. Garcia, Edward Moody, and Jeffrey Tobolski on the Cook County Board. Pursuant to Federal Rule of Civil Procedure 25(d), the new commissioners automatically replaced the former commissioners as defendants in this lawsuit. See also *Vasquez v. Foxx*, 895 F.3d 515, 518, n.1 (7th Cir. 2018) (recognizing that upon being sworn into office, the new State's Attorney became a defendant in a pending federal case pursuant to Federal Rule of Civil Procedure 25(d)). [94, at 1.]

Forest Preserve District of Cook County Police Department and Chief of Police Sylvester Bush, in his official capacity[5], and the Forest Preserve District of Cook County[6] (collectively the "County Defendants").  On October 15, 2018, Plaintiff filed an amended complaint [43-1.]  Count I alleges that 430 ILCS 66/65(a)(14) and FPDCC Code Section 3-3-6 violate the Second Amendment of the United States Constitution.  Count II alleges a violation of the Due Process Clause of the Fourteenth Amendment and Count III alleges a violation of the Equal Protection Clause of the Fourteenth Amendment.

On May 29, 2019, the State of Illinois filed a motion to intervene as of right to defend the constitutionality of a state statute [63], which the Court granted [67].  The parties filed cross motions for summary judgment [100, 102, 103], which are now before the Court.

## II.     Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by * * * citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking

---

[5] As of January 2020, Sylvester Bush replaced Interim Chief Cynthia Lance to serve as the Chief of the Forest Preserve District of Cook County Law Enforcement. Accordingly, Bush automatically replaces Kelvin Pope, who served as the Chief when this lawsuit was brought, as a defendant in this lawsuit. [*Id*. at 2.]

[6] The Cook County Board of Commissioners also serves as the Forest Preserve District of Cook County Board of Commissioners. See Forest Preserve District of Cook County Ordinance 1-5-1: 1-2. [*Id.*]

summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted). Where, as here, the parties have filed cross-motions for summary judgment, "'we view all facts and inferences in the light most favorable to the nonmoving party on each motion.'" *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787 (7th Cir. 2015) (quoting *Wis. Alumni Research Found. v. Xenon Pharm., Inc*., 591 F.3d 876, 882 (7th Cir. 2010)).

## III. Analysis

The Court first clarifies the scope of the legal challenge presented—specifically, whether Plaintiff is bringing a facial challenge or an as-applied challenge. In a facial challenge, "the claimed constitutional violation inheres in the terms of the statute, not its application. * * * The remedy is necessarily directed at the statute itself and *must* be injunctive and declaratory; a successful facial attack means the statute is wholly invalid and cannot be applied *to anyone.*" *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) ("*Ezell I*") (emphasis in original). In contrast, an as-applied challenge targets a law "in operation," as it was applied to an individual, and limited to the specific facts of that case. *Berron v. Illinois Concealed Carry Licensing Rev. Bd.*, 825 F.3d 843, 846 (7th Cir. 2016); see also *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).

Plaintiff brings a facial challenge against 430 ILCS 66/65(a)(14) and FPDCC Code Section 3-3-6. The amended complaint seeks declaratory and injunctive relief directed at Section 65(a)(14) and Ordinance 3-3-6, and the government officials who enforce them. [104 at 8-9.] It also asks

16

the Court to invalidate both laws "in that and to the extent that they are applied to prohibit private citizens who are otherwise qualified to possess handguns from carrying handguns for self-defense in forest preserves of [C]ook [C]ounty." [104 at 8-9]. Plaintiff does not contend that anything specific about him or his arrest on April 30, 2015, or the adjudication of his ordinance violation, makes Section 65(a)(14) or Ordinance 3-3-6 unconstitutional. While writing "applied" in the description of the relief sought is an admirable attempt to turn the claim into an as-applied challenge, the careful observer will note that the regulations govern only concealed carry license holders, the only class of persons permitted to carry concealed weapons in Illinois. In other words, Plaintiff challenges the law as it is applied to every person to whom it applies, meaning Plaintiff believes it cannot be applied to anyone consistent with the Constitution. Furthermore, the absence of any reliance by Plaintiff on any facts concerning how the law was applied *to him specifically* support the conclusion that his suit is a facial challenge, not an as-applied one. See *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 133 n.10 (1992) (noting that facts concerning how law was applied to plaintiff were irrelevant to facial challenge). Despite Plaintiff's protests to the contrary, his suit is an as-applied challenge.

Plaintiff's brief foray into reciprocal concealed carry licenses, interstate travel and the commerce clause (see [108 at 2-3]) does not support his argument that the challenge to Section 65(a)(14) and Ordinance 3-3-6 is as-applied. First, each of these issues is underdeveloped to the point that the Court is not entirely sure how they relate to the scope of the challenge. *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).") And second, Plaintiff here asks the Court to consider: (1) people who are not Illinois concealed carry permit holders; (2) residents of Arkansas, Idaho, Mississippi,

Nevada, Texas and Virginia who may obtain a concealed carry permit from Illinois; and (3) people travelling in interstate commerce. [108 at 1-3.]  As Plaintiff falls into none of those categories, the Court would have to entertain them as hypotheticals—something it cannot do in an as-applied challenge. *United States v. Phillips,* 645 F.3d 859, 863 (7th Cir. 2011) (in analyzing an as-applied challenge, the court must only examine the facts of the case before it, "not any set of hypothetical facts under which the statute might be unconstitutional").  Plaintiff's own briefing confirms that he is bringing a facial challenge, not an as-applied challenge.

### A.    Framework for Analyzing Second Amendment Cases

The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In *District of Columbia v. Heller,* the Supreme Court held that the Second Amendment codifies a preexisting "individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008).  *Heller* struck down the District of Columbia's ban on the possession of usable handguns in the home because the law prevented citizens from using, or even having, "the quintessential self-defense weapon" in the place where the "need for defense of self, family, and property is most acute." *Id.* at 628–29, 635.  But *Heller* left open many questions related to the Second Amendment, including what level of scrutiny to apply to firearms regulations, and determined only that Washington D.C.'s ban on possession of useable handguns in the home would fail "any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628–29.

The Supreme Court also made clear that its ruling would not invalidate all restrictions on owning or carrying firearms:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27.  The Supreme Court did not otherwise explain what regulations would pass constitutional scrutiny or elaborate on what counts as a "sensitive place" or "longstanding prohibition."

Shortly after *Heller*, in *McDonald v. City of Chicago*, the Supreme Court struck down ordinances in Chicago and nearby suburb Oak Park that banned residents from having handguns in their homes. 561 U.S. 742 (2010).  That opinion held that the Due Process Clause of the

Fourteenth Amendment incorporates against state and local governments the Second Amendment

right to possess a handgun in the home for self-defense. *Id.* at 791. The Court again noted that its

holding did not imperil every law regulating firearms. *Id.* at 786.

*McDonald* did not resolve questions of what level of scrutiny applies to firearms

regulations, but the Seventh Circuit has begun to address that issue. The Seventh Circuit has

summarized its framework as follows:

> After *Heller*, we developed a two-step test for Second Amendment challenges.
> "The threshold question is whether the regulated activity falls within the scope of
> the Second Amendment." *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir.
> 2017) ("*Ezell II*"). "This is a textual and historical inquiry; if the government can
> establish that the challenged law regulates activity falling outside the scope of the
> right as originally understood, then 'the regulated activity is categorically
> unprotected, and the law is not subject to further Second Amendment review.'" *Id.*
> (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011) ("*Ezell I*")).
> However, "if the historical evidence is inconclusive or suggests that the regulated
> activity is *not* categorically unprotected[,] then there must be a second inquiry into
> the strength of the government's justification for restricting or regulating the
> exercise of Second Amendment rights." *Id.* (quoting *Ezell I*, 651 F.3d at 703). At
> step two, we evaluate "the regulatory means the government has chosen and the
> public-benefits end it seeks to achieve." *Id.* (quoting *Ezell I*, 651 F.3d at 703). The
> rigor of the review is dependent on "how close the law comes to the core of the
> Second Amendment right and the severity of the law's burden on the right." *Id.*
> (quoting *Ezell I*, 651 F.3d at 703). "Severe burdens" on this core right "require a
> very strong public-interest justification and a close means-end fit; lesser burdens,
> and burdens on activity lying closer to the margins of the right, are more easily
> justified." *Id.* The government has the burden "of justifying its law under a
> heightened standard of scrutiny; rational-basis review does not apply." *Id.* We have
> consistently described step two as "akin to intermediate scrutiny" and have required
> the government to show that the challenged statute is substantially related to an
> important governmental objective. *United States v. Meza-Rodriguez*, 798 F.3d 664,
> 672 (7th Cir. 2015) (citing cases).

*Kanter v. Barr*, 919 F.3d 437, 441–42 (7th Cir. 2019).

A few key points about this two-step analysis from Seventh Circuit precedent will prime

this Court's review of Section 65(a)(14) and Ordinance 3-3-6. First, in the historical inquiry, the

Seventh Circuit established in *Moore v. Madigan* that the relevant date for analyzing the scope of

Second Amendment rights is 1791.[7] 702 F.3d 933, 935 (7th Cir. 2012). Additionally, laws from the relevant historical period that do not regulate the same firearms-related activity, or do not do so in a similar way, are not persuasive evidence that the activity at issue fell outside the right to keep and bear arms as of 1791. See *Ezell I*, 651 F.3d at 705 (rejecting City of Chicago's historical evidence and concluding that the City failed to show that target practice was unprotected by the Second Amendment because "most of the statutes cited by the City are not specific to controlled target practice and, in any event, contained significant carveouts and exemptions.").

Second, the "means-ends" test in step two is "is a sliding scale and not fixed or static." *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 934 (N.D. Ill. 2014). *Moore* elaborates on *how* the level of scrutiny in the second-step means-end analysis varies according to the breadth of the challenged Second Amendment restriction. Specifically, "*Moore* makes clear that the breadth of restriction is not just a function of *what* is affected, but also *who* is affected." *Id.* at 936 (emphasis in original). For example, in *Moore*, the Seventh Circuit struck down a state-wide ban on carrying firearms in public. When determining how closely to scrutinize the law, the court looked to two factors: how much activity was regulated (a blanket prohibition of gun carriage, and not a lesser burden on armed self-defense), and who was regulated (law-abiding citizens, and not only people with criminal records). *Id.* It required the state to make a very strong empirical showing to justify the law because the ban implicated "the gun rights of the entire law-abiding adult population of Illinois." *Moore*, 702 F.3d at 940. In contrast, in *United States v. Skoien*, the appeals court upheld a ban on domestic violence misdemeanants possessing firearms, in part because the law was limited to those convicted of domestic violence, as opposed to regulating law-abiding citizens. 614 F.3d 638 (7th Cir. 2010) (en banc).

---

[7] For a thorough discussion of this point, see *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 935 (N.D. Ill. 2014).

To sum up, under the Seventh Circuit's framework for analyzing firearms regulations, Defendants bear the burden of showing that Section 65(a)(14) and Ordinance 3-3-6 prohibit activity that was understood in 1791 to be outside the scope of the Second Amendment. If the activity was within the scope of the Second Amendment at that time, or if the historical evidence is inconclusive, Defendants must then offer evidence showing that the regulations' burden on Second Amendment rights is justified by the ends the government achieves through the regulation. In analyzing that evidence, the Court considers the strength the governmental interest that the regulation serves and the "fit" between that end and the chosen means, including whose rights the regulation affects and how severely the regulation burdens rights within or close to the core of the Second Amendment. The more law-abiding people it affects or the heavier the burden on a right close to the core, the closer the scrutiny the regulation receives.

## B. The Scope of the Second Amendment

At the first step, Defendants bear the burden of demonstrating that the regulated activity is categorically outside the scope of the Second Amendment as it was understood in 1791. *Moore,* 702 F.3d at 935; *Ezell I,* 651 F.3d at 702-03. Defendants articulate this position in two ways: first, by citing a pair of 18th century statutes to argue that carrying weapons in wooded areas was forbidden in 1791, and second, by asserting that all of the Forest Preserve District is a "sensitive area," the regulation of which they say is beyond the bounds of the Second Amendment. Neither argument is convincing.

### 1. Identifying the Regulated Activity

To conduct this step of the analysis, the Court must first determine the regulated activity. Plaintiff argues that it is "licensed carrying of a firearm outside the home," [103-3 at 3], which is too broad a formulation, as both Section 65(a)(14) and Ordinance 3-3-6 apply only to FPDCC

property, not all areas outside the home. The County Defendants address the regulated activity as "the carrying of firearms on FPDCC property" [106 at 10], which, while technically accurate, is difficult to slot into the historical and textual analysis. Intervenor Defendant suggests that the activity at issue is "carry[ing] firearms…while outside and within the borders of government property where family recreation occurs," [103 at 5], which is a far more reasonable formulation than what Plaintiff offers but may go too far. "[W]here family recreation occurs" is a characterization that the record supports for some places in the FPDCC, but not others (as discussed in detail below), so that framing must be pared back. Considering the range of areas regulated by Section 65(a)(14) and Ordinance 3-3-6, the best way to describe the regulated activity is "carrying a concealed firearm in a public recreational area."

### 2. Historical and Textual Analysis of the Scope of the Second Amendment

The historical and textual analyses are inconclusive at best. The Seventh Circuit has held that there is a right to carry outside the home, in part pointing to examples and hypotheticals from the eighteenth century. See, *e.g.*, *Moore*, 702 F.3d at 936 ("[O]ne doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home."). But how far, and where, outside the home that right extended is uncertain, and it is particularly muddy in this case because it is not clear that the framers of the Constitution had any conception of public recreational areas like the ones at issue here. See *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*, 212 F. Supp. 3d 1348, 1361 (N.D. Ga. 2016) ("[I]t may have been hard for the framers to comprehend a wilderness 'recreational facility' at all, much less one owned and operated by the federal government."). As

a result, it is difficult to say that carrying a firearm for self-defense in such areas was or was not withing the understanding of the Second Amendment in 1791.[8]

Nonetheless, in support of its argument that the regulated activity is outside the scope of the Second Amendment, the State of Illinois points to two colonial laws that prohibited carrying firearms in wooded areas, [103 at 6], one from Pennsylvania[9] and one from New Jersey,[10] but neither takes Defendants' argument very far. First, both statutes exempt anyone carrying a firearm or hunting if that person has a license, but there is no licensing or permitting scheme that allows concealed carry on FPDCC property (and the Court expresses no opinion on whether any hypothetical permitting scheme would allow the law to pass constitutional muster). Second, both statutes primarily regulated hunting, not carrying for self-defense, and applied to private property—regulating a person's action on "the improved or inclosed lands of any plantation other

---

[8] *Concealed* carry is an even more complicated question, as the country's understanding of and tolerance toward concealing firearms in public has changed greatly over time. Eugene Volokh*, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1522–23 (2009).

[9] The Statutes at Large of Pennsylvania, c. 142, p. 254, An Act to Prevent the Killing of Deer out of Season, And Against Carrying of Guns or Hunting by Persons not Qualified, which reads in relevant part: "[I]f any person or persons shall presume, ... to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation, and shall thereof convicted ... he shall for every such offense forfeit the sum of ten shillings." (DUKE CENTER FOR FIREARMS LAW, *available at* https://firearmslaw.duke.edu/search-results/?_sft_subjects=sensitive-times-and-places&_sfm_law_year=602+1936#1685) (last visited September 10, 2021).

[10] 1718-1741 N.J. Laws 101, An Act to Prevent Killing of Deer out of Season and against Carrying of Guns and Hunting by Persons not Qualified, ch. 35, § 4, which reads in relevant part, "[T]hat if any Person or Persons shall presume, at any Time after the Publication hereof, to carry any Gun, or hunt on the improved or inclosed Lands in any Plantation, other than his own unless he have Licence or Permission from the Owner of such Lands or Plantation . . . And if any person whatsoever, who is not owner of one hundred acres of land, or otherwise qualified, in the same manner as persons are or ought to be electing representatives to serve in general assembly shall at any time after the publication hereof, carry any gun, or hunt in the woods or unenclosed lands, without license or permission obtained from the owner or owners of such lands . . . such offender shall forfeit and pay the sum of ten shillings." (DUKE CENTER FOR FIREARMS LAW, *available at* https://firearmslaw.duke.edu/search-results/?_sft_subjects=sensitive-times-and-places&_sfm_law_year=602+1936#1685) (last visited September 10, 2021).

than his own"—not public spaces. In contrast, when the Seventh Circuit addressed the self-defense needs of people in that time period, it described a hypothetical resident of the Ohio Valley in the eighteenth century needing "to leave [his] home to obtain supplies from the nearest trading post" and observed that "en route [he] would be as much (probably more) at risk if unarmed as one would be in one's home unarmed." *Moore*, 702 F.3d at 936. The discussion in *Moore* suggests that carrying a firearm for self-defense in wooded areas was well within the scope of the Second Amendment in 1791, not categorically excluded from it.

Even if these statutes had addressed carrying firearms for self-defense in public recreational areas, they would likely not be enough to carry the day. The Seventh Circuit has previously found that offering two historical statutes "falls far short of establishing that [a regulated activity] is wholly outside the Second Amendment as it was understood" in 1791. *Ezell I*, 651 F.3d at 706; see also *Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 937 (citation to "a few isolated statutes—even to those from the appropriate time period" is insufficient to establish that an activity was historically unprotected by the Second Amendment).

In sum, the Seventh Circuit has recognized a right to carry firearms outside the home for self-defense purposes, and the record contains little evidence about the history of that right on publicly owned land, whether developed into a public recreational space or undeveloped and left as wilderness. The historical and textual evidence does not persuade the Court that licensed concealed carry of firearms for self-defense in public recreational areas was categorically outside the scope of the Second Amendment as it was understood in 1791.

### 3. Sensitive Places Analysis

Defendants also argue that the FPDCC is a "sensitive place" as referenced in *Heller* because of the presence of children on its properties, and therefore the regulation of firearms in the

FPDCC is beyond the scope of the Second Amendment. This position raises two questions: whether the FPDCC is a "sensitive place," and, if so, whether that shields Section 65(a)(14) and Ordinance 3-3-6 from constitutional scrutiny. The answer to both questions is "no."

> a. The Record Does Not Establish that the Entirety of the FPDCC is A "Sensitive Place"

The first question is whether the FPDCC is a "sensitive place" in which the regulation of firearms is "presumptively lawful," as contemplated by *Heller*. Defendants argue that the FPDCC is a sensitive place because children tend to gather on its properties. [113 at 3] ("the Ordinance protects children in family-oriented, sensitive areas designed for their education and enjoyment"); [115 at 9] (arguing that the FPDCC is a sensitive place "because it is a recreational space where children tend to congregate"). Plaintiff argues that it is not appropriate for the Illinois General Assembly to call all 70,000 acres of the Forest Preserve District a "sensitive place" with a single stroke of a pen. (Plaintiff also argues that it is illogical to call Cook County's forest preserve district a sensitive place but not to do the same for any of the forest preserve districts in Illinois' 101 other counties. Defendants persuasively respond that the FPDCC is different in terms of the number of visitors it has and the size of some of its attractions. However, as discussed below, the critical issue in this case is not the difference between the FPDCC and forest preserves in other counties, but the differences among the various FPDCC sites.)

The Seventh Circuit has not directly addressed how to determine whether a location is properly designated a "sensitive place," so the Court begins with the origin of the term. In *Heller*, the Supreme Court wrote that its decision should not be taken to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or *laws forbidding the carrying of firearms in sensitive places such as schools and government buildings*, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–

27 (emphasis added). The Supreme Court then added, "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26.

From the examples of sensitive places—schools and government buildings—courts have tried to discern the rationale for the category, and the traits that underlie the designation seem to be gatherings of large groups of people or performance of government functions. See, *e.g.*, *Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010) ("The Court listed schools and government buildings as examples, presumably because possessing firearms in such places risks harm to great numbers of defenseless people (*e.g.*, children). Along the same lines, we notice that government buildings and schools are important to government functioning."); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1127 (10th Cir. 2015) (upholding ban on carrying firearms on United States Postal Service property in part because the regulation "affects private citizens only insofar as they are doing business with the USPS on USPS property"); *GeorgiaCarry.org, Inc.*, 212 F. Supp. 3d at 1361 (Army Corps of Engineers dam facility, which was "vitally important to our national security and well being," was a "sensitive place").

When a location is designated as a "sensitive place," all examples of that location tend to have the trait that justifies the designation. For instance, all schools have groups of children present, and all United States Post Offices have government employees carrying out government business with and for members of the public. In contrast, when a regulation sweeps up different types of locations, with rationales that differ or vary in strength, it tends to fare poorly on judicial review. For example, *Moore* struck down a state-wide ban, and *Ezell* struck down what was effectively a city-wide ban.

Turning to the FPDCC, the first problem is that it is not a single place or type of place—it is a large set of "distinct, non-adjacent" places, [113 at 9], covering 70,000 acres, which is more

than 11% of the land in Cook County [115 at 6-7] and an area roughly half the size of the City of Chicago.[11] The record does not state how many different FPDCC sites there are, but the FPDCC website has a location list,[12] which contains roughly 320 separate entries, though it is difficult to tell how many separate pieces of property or sites there are. Some locations are listed as part of another entry on the list, such as "Barrington Road Pond (part of Arthur L. Janura Preserve)," and some entries are named with cardinal directions that suggest they are different portions of the same location, such as "Miller Meadow-North" and "Miller Meadow-South." Despite the difficulty of determining the exact number of properties—perhaps that is why the parties did not offer one[13]—it is clear that the FPDCC is comprised of scores, if not hundreds, of different locations.

Crucially, not all FPDCC locations are of the same type. On one end of the spectrum is the Chicago Botanic Garden, an example Defendants repeatedly point to, which hosts roughly a million visitors per year and offers a wide range of facilities and activities. [94 at 4.] The Chicago Botanic Garden offers adult education classes, symposia, professional certificate programs,[14] and spans 385 acres, including 26 gardens and four natural areas.[15] On the other end of the spectrum

---

[11] According to the U.S. Census Bureau, the City of Chicago covers an area of 227.63 square miles. https://www.census.gov/quickfacts/chicagocityillinois (last visited September 10, 2021). 227.63 square miles is 145,683.2 acres, or slightly more than double the size of the FPDCC. The Court can take judicial notice of these figures because their accuracy is readily determined from a source—the United States Census Bureau—whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)(2).

[12] The Court can take judicial notice of the number of entries on the location list because its accuracy is readily determined from a source—the FPDCC's website—whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)(2); https://fpdcc.com/places/locations/ (last visited September 10, 2021).

[13] The joint stipulation of facts does provide the number of forest preserve properties for Kane County (94, see [94 at ¶ 85]), DuPage County (60, see [*id.* at ¶ 94]), Will County (82, see [*id.* at ¶ 103]), Lake County (63, see [*id.* at ¶ 112]), and McHenry County (more than 35, see [*id.* at ¶ 121]).

[14] See https://fpdcc.com/about/brookfield-zoo-chicago-botanic-garden-partnerships/ (last visited September 10, 2021).

[15] See https://fpdcc.com/places/locations/chicago-botanic-garden/ (last visited September 10, 2021).

is, for example, Bluff Spring Fen, a nature preserve that allows hiking but bars fishing and even dogs and has no obvious developments besides a parking lot.[16] The FPDCC is not a single place, or even a category of the same kinds of places, like schools and post offices are; rather, it is a wide range of different sites with different facilities that are all owned by the Forest Preserve District.

That range is a problem for Defendants' position. They point to no cases in which a court determined that such a spread of locations could be designated a single "sensitive place," or cases in which the existence of one sensitive place justified regulation of a non-adjacent, separate location (or many of them). Some cases have allowed regulations on firearms to extend to the area immediately around a sensitive place—such as school zones, *United States v. Redwood*, 2016 WL 4398082 (N.D. Ill. Aug. 18, 2016), post office parking lots, *Bonidy*, 790 F.3d at 1123, and a parking lot 1,000 feet away from the entrance to the U.S. Capitol and a block from the Rayburn House Office Building, *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019). But no case that the Court is aware of has even hinted that properly designating one location a "sensitive place" allows the government to give the same designation to a different, non-adjacent location.

Nor is calling the entire FPDCC a sensitive place well-supported by Defendants' rationale that children are present on FPDCC property, or the other common justification, the presence of large gatherings of people. Certainly *some* FPDCC locations have one or both of these traits, but, as discussed in more detail below, the record does not demonstrate the presence of children or large crowds on all FPDCC sites, or reveal how many FPDCC sites have these traits. Perhaps the presence of children would qualify those FPDCC sites as "sensitive places," but Defendants do not present, and the Court is not aware of, any authority for treating all of the "distinct, non-adjacent" locations as "sensitive places" merely because a subset of them qualify.

---

[16] See https://fpdcc.com/places/locations/bluff-spring-fen/ (last visited September 10, 2021).

The cases Defendants do cite are distinguishable, largely because the regulations at issue in those cases come from the government acting as a proprietor, not as a sovereign. *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers* is the prime comparison. 212 F. Supp. 3d 1348, 1365 (N.D. Ga. 2016). In *GeorgiaCarry*, the Northern District of Georgia considered a regulation—36 C.F.R. § 327.13—that prohibited possession of a firearm on Army Corps of Engineers property, in that instance Allatoona Lake and Lake Thurmond. Allatoona Lake was created by an Army Corps of Engineers dam, and the property, approximately 25,747 land acres, contained a variety of recreational areas open to the public. *Id.* at 1355. Similarly, Lake Thurmond was created by an Army Corps dam and a portion of its property was classified as recreational. *Id.* at 1357.

The court upheld the prohibition, relying on the military nature of the property. First, the court noted that each dam was an Army Corps of Engineers facility whose national security implications made it a "sensitive place" under the logic of *Heller*. *Id.* at 1362. The recreational areas on the property were "merely a byproduct of the sensitive dam construction projects nearby" and not the reason that the property was a "sensitive place." *Id*. at 1361. It was the military nature of the property that drove the determination that the regulation was outside the scope of the Second Amendment. See *id.* at 1361–62 ("[T]he Court cannot fathom that the framers of the Constitution would have recognized a civilian's right to carry firearms on property owned and operated by the United States Military, especially when such property contained infrastructure products central to our national security and well being."). Here, by contrast, there is no suggestion that any part of the FPDCC, much less all of it, is a military installation or has national security implications, so the foundation of the *GeorgiaCarry* decision is missing.

Additionally, the *GeorgiaCarry* court supported its decision by determining that the regulation was a "managerial action," a rule in which the government acts "as proprietor, to manage [its] internal operation," *id.* at 1367 (quoting *Engquist v. Oregon Dept., of Agric.*, 553 U.S. 591, 598 (2008)), as distinguished from the government acting as a sovereign or lawmaker and exercising power to regulate or license. Again, the crucial ingredient for this conclusion was military property. Although the properties were open to the public "in some limited respects," they ultimately "remain[ed] under the control and regulation" of the United States military. *Id.* at 1368. The FPDCC does not fall in this category of property, and the regulations at issue here are not managerial rules but exercises of the Illinois General Assembly's power to regulate as a lawmaker. While the FPDCC is government property, it exists "for the purpose of the education, pleasure, and recreation of the public." [94 at ¶ 6.] It is doubtful that the state or county could entirely exclude the public from such a property, unlike the land at issue in *GeorgiaCarry*. 212 F. Supp. 3d at 1363 ("there is little doubt that Defendant Army Corps could exclude civilians from its property altogether"). The other sections of 430 ILCS 66/65(a) support this conclusion. Only a few of the twenty-three types of locations identified in this statute are places where the government conducts its own business. The remainder—zoos, amusement parks, sports arenas, athletic facilities, child care facilities, hospitals, bars, and so on—are not places where the state government manages its own affairs, and the sections prohibiting concealed carry in those places, like the forest preserves, are legislative rules, not managerial rules.

Another problem with relying on *GeorgiaCarry* is that its perspective is on the Army Corps firearms regulation is far from unanimous. The District of Idaho found that that 36 C.F.R. § 327.13 violated the Second Amendment and rejected the "sensitive place" argument, finding that *Heller* and its progeny "limited the 'sensitive place' analysis to facilities like 'schools and government

buildings,'" not "outdoor parks" like Army Corps recreational areas. *Morris v. U.S. Army Corps of Engineers*, 60 F. Supp. 3d 1120, 1124-25 (D. Idaho 2014). In response to the ruling, the Army Corps later issued command guidance for considering written requests from individuals to carry firearms on at Army Corps recreational sites. See *Command Guidance in Considering Firearm Possession Requests Under 36 C.F.R. 327.13(a), Explosives, Firearms, other Weapons and Fireworks to the Commanders, Major Subordinate Commands and District Commands, Chiefs Operation Division*, Memorandum from the Dep't of Def., (May 14, 2018)[17]; see also David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 275 (2018).

*Bonidy*, too, is unpersuasive because it affirmed a bar on carrying weapons on U.S. Post Office Property as a managerial rule. *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1127 (10th Cir. 2015). The Tenth Circuit supported its decision by reasoning that, "[a]s a government-owned business acting as a proprietor rather than as a sovereign, the USPS has broad discretion to govern its business operations according to the rules it deems appropriate." *Id.* at 1126.

The other cases on which Defendants rely fare no better. *United States v. Masciandaro* specifically declined to determine whether an area on the Potomac River managed by the National Park Service qualified as a "sensitive place," so the case yields nothing instructive on that issue. 638 F.3d 458, 473 (4th Cir. 2011).[18] In *Nordyke*, the Ninth Circuit upheld a county ordinance

---

[17] Available at: https://corpslakes.erdc.dren.mil/employees/cecwon/pdfs/18May14-FirearmsPossessionGuidance.pdf

[18] Furthermore, after that plaintiff's arrest for possession of a firearm on National Park property, Congress enacted legislation allowing possession of firearms in National Parks, as long as it was consistent with state and local laws. See Credit Card Accountability Responsibility and Disclosure Act of 2009, Pub.L. No. 111-24, § 512(b), 123 Stat. 1734, 1765 (2009); 54 U.S.C. § 104906; see also 36 C.F.R. § 2.4(a) (regulation implementing the new law, which states: "None of the provisions in this section or any regulation in this chapter may be enforced to prohibit an individual from possessing a firearm, including an assembled or functional firearm, in any National Park System unit if: (1) The individual is not otherwise prohibited by

prohibiting carrying firearms on "open space venues, such as County-owned parks, recreational areas, historic sites, parking lots of public buildings ... and the County fairgrounds," in large part because the court believed that large gatherings of people made them sensitive places in the same category as schools and government buildings. *Nordyke v. King*, 563 F.3d 439, 460 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010). But *Nordyke* was vacated after the Supreme Court handed down its decision in *McDonald*, and, as the Ninth Circuit clarified, "[t]he three-judge panel opinion shall not be cited as precedent by or to any court of the Ninth Circuit" (*Nordyke,* 575 F.3d 890), so it has no binding effect in its home circuit and little persuasive value elsewhere. Furthermore, the Seventh Circuit has not made the leap from schools and government buildings to large open spaces like the county fairgrounds at issue in *Nordyke*. And even if it had, such reasoning would support Section 65(a)(14) and Ordinance 3-3-6 only as it applied to FPDCC sites that, per Defendants' evidence, are open spaces where large groups of people gather together. That might cover sites such as the Botanic Gardens and athletic facilities Defendants describe, but Defendants have not shown that *all* FPDCC sites share those characteristics.

In *Warden v. Nickels*, the Western District of Washington upheld a Seattle rule prohibiting the concealed carry of firearms "at certain parks facilities where children and youth are likely to be present." 697 F. Supp. 2d 1221, 1224 (W.D. Wash. 2010). But it did so under the state constitution, not the Constitution of the United States, and even thought it adopted reasoning from *Heller*, the rule at issue in *Nickels* was limited to places were children were likely to be, not to any and all real property owned by the park district.

---

law from possessing the firearm; and (2) The possession of the firearm is in compliance with the law of the State in which the National Park System unit is located."). Though Defendants point to both *Masciandaro* and *GeorgiaCarry* as support for tighter restrictions on carrying firearms, it is interesting to note that rulemaking bodies subsequently loosened the regulations at issue, or their enforcement, in both cases.

b. <u>"Sensitive Places" Are Not Immune from Constitutional Scrutiny</u>

Even if the entire FPDCC were a "sensitive place," or each FPDCC location were a separate "sensitive place," the regulations would not escape review. Defendants argue that they ought to, saying that the "presumptively lawful" language in *Heller* means that bans on carrying firearms in "sensitive places" are outside the scope of the Second Amendment and the Court's analysis should end here, finding the regulations constitutional. [103 at 5-6; 106 at 10-11.] For support, Defendants cite *United States v. Marzzarella*, which interprets Heller's "list of presumptively lawful regulations" as "exceptions to the Second Amendment guarantee." 614 F.3d 85, 91 (3d Cir. 2010).

But the Seventh Circuit has taken a contrary position. In *United States v. Williams*, the Seventh Circuit considered the constitutionality of the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1). 616 F.3d 685 (7th Cir. 2010). In assessing one of the other "presumptively lawful" regulations mentioned in *Heller*—the prohibitions on the possession of firearms by felons—the Seventh Circuit wrote that "*Heller* referred to felon disarmament bans only as 'presumptively lawful,' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge. Therefore, putting the government through its paces in proving the constitutionality of § 922(g)(1) is only proper." *Id.* at 692. Defendants object that *Williams*' direction to analyze "presumptively lawful" regulations cannot apply here, because *Williams* was an as-applied challenge to the law, and Plaintiff is bringing a facial challenge. [115 at 15.] But that is not how courts in this district have applied *Williams*. For example, the court in *United States v. Redwood* considered both a facial and as-applied challenge to 18 U.S.C. § 922(q)(2)(A), which bans possession of firearms in school zones. 2016 WL 4398082, at *2 (N.D. Ill. Aug. 18, 2016). The *Redwood* opinion interpreted *Williams'* holding to mean "that courts should apply some level of scrutiny even to those regulations

identified in *Heller* as presumptively lawful." *Id.* at *4 (citing *Williams*, 616 F.3d 692). It also specifically rejected the argument that Second Amendment challenges to regulations of "sensitive places" are foreclosed and no further scrutiny is necessary. *Id.* (noting that "this approach does not comport with Seventh Circuit's directive in *Williams*.").

Defendants' position is also inconsistent with other Second Amendment jurisprudence in the Seventh Circuit. To begin, the original panel decision in *United States v. Skoien* addressed directly *Heller*'s passage on longstanding historical prohibitions, sensitive places, and commercial regulations. 587 F.3d 803, 808 (7th Cir. 2009), *reh'g en banc granted, opinion vacated*, No. 08-3770, 2010 WL 1267262 (7th Cir. Feb. 22, 2010), and *on reh'g en banc*, 614 F.3d 638 (7th Cir. 2010). The court of appeals wrote:

> There are several ways to understand this limiting language. We note for starters that it is dicta, and although we can hardly ignore it, *we think it would be a mistake to uphold this or other gun laws simply by invoking the Court's reference to these "presumptively lawful regulatory measures," without more*. But beyond that, it is not entirely clear whether this language should be taken to suggest that the listed firearms regulations are presumed to fall outside the scope of the Second Amendment right as it was understood at the time of the framing or that they are presumptively lawful under even the highest standard of scrutiny applicable to laws that encumber constitutional rights. The Court said it was not attempting "an exhaustive historical analysis today of the full scope of the Second Amendment," *[Heller]*. at 2816, and specifically deferred judgment on the outer limits of its original meaning: "[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us," *id.* at 2821. The Court also conspicuously declined to set a standard of review. *Id.* at 2817. *We take all this to mean that gun laws—other than those like the categorically invalid one in* Heller *itself—must be independently justified*.

*Id.* (emphasis added). Though this opinion was vacated, nothing in the subsequent *en banc* opinion undermines the understanding of *Heller's* "presumptively lawful" language in the quoted passage, and subsequent cases have proceeded consistent with its reasoning. See, *e.g.*, *Ezell II*, 846 F.3d at 894–95 (7th Cir. 2017) (casting doubt on the view that *Heller*'s "sensitive places" passage immunizes regulations of those areas from constitutional review); *United States v. Redwood*, 2016

WL 4398082, at *2 (N.D. Ill. Aug. 18, 2016); see also *Masciandaro*, 638 F.3d at 472 ("The Court's use of the word 'presumptively' suggests that the articulation of sensitive places may not be a limitation *on the scope* of the Second Amendment, but rather on the analysis to be conducted with respect to the burden on that right.") (emphasis in original).

To sum up: the textual and historical analysis does not establish that the regulated activity was entirely outside the Second Amendment as it was understood in 1791; the record does not demonstrate that all of the properties of the FPDCC should be treated as a single "sensitive place" as contemplated by *Heller* (or that each FPDCC site is, individually, a sensitive place); and even if the entire FPDCC were a sensitive place (or many sensitive places), that would not shield Section 65(a)(14) and Ordinance 3-3-6 from constitutional scrutiny. For these reasons, the Court proceeds to undertake that constitutional scrutiny.

### C. Analysis of the Government's Justification for the Restriction of Second Amendment Right

#### 1. The Appropriate Level of Scrutiny

Since *Heller*, many courts that have considered limits on possessing or carrying firearms have applied intermediate scrutiny to those regulations. See, *e.g.*, *Skoien*, 614 F.3d 638; *Kanter*, 919 F.3d at 447; *United States v. Redwood*, 2016 WL 4398082, at *4 (N.D. Ill. Aug. 18, 2016); see also *Masciandaro*, 638 F.3d at 471; *GeorgiaCarry.org, Inc.*, 212 F. Supp. 3d at 1368. But the Seventh Circuit has made clear that this level of scrutiny is not fixed or static, but a sliding scale. *Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 934. In determining how closely to examine the fit between a regulation and its purported goal—the government's chosen means and the ends it pursues—courts should consider whose rights the regulation affects and how severely the regulation burdens rights within or close to the core of the Second Amendment. The more

law-abiding people it affects or the heavier the burden on a right close to the core, the stricter the scrutiny the regulation receives.

Following *Moore*, the Court begins with who is regulated and how much activity is regulated. Section 65(a)(14) and Ordinance 3-3-6 govern behavior of law-abiding CCL holders, which means the Court should scrutinize it more closely. *Moore*, 702 F.3d at 940 (government had to make a very strong showing that the ban on carrying firearms outside the home was vital to public safety because the regulation curtailed the "gun rights of the entire law-abiding adult population of Illinois").

Next, Section 65(a)(14) and Ordinance 3-3-6 regulate carrying firearms for self-defense purposes, which is close to the core of the Second Amendment. While *Heller* and its progeny primarily recognized a right to possess handguns for purposes of self-defense in the home, those cases and subsequent Seventh Circuit precedent strongly suggest a closely related right to carry handguns for self-defense outside of the home. *Heller* itself observed that the right to "bear arms" historically referred to a right to "wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person." 554 U.S. at 584, (quoting *Muscarello v. United States*, 524 U.S. 125, 143, (1998) (Ginsburg, J., dissenting)) (alterations omitted and emphasis added). Conflict with another person is at least as likely to arise outside the home as inside it—in Judge Posner's words:

> [A] Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower. A woman who is being stalked or has obtained a protective order against a violent ex-husband is more vulnerable to being attacked while walking to or from her home than when inside. She has a stronger self-defense claim to be allowed to carry a gun in public than the resident of a fancy apartment building (complete with doorman) has a claim to sleep with a loaded gun under her mattress.

*Moore*, 702 F.3d at 937; see also *Wrenn v. District of Columbia*, 864 F.3d 650, 657 (D.C. Cir. 2017) ("[T]he Amendment's core lawful purpose is self-defense, and the need for that might arise beyond as well as within the home." (internal quotation marks and citation omitted)); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1515 (2009) ("[S]elf-defense has to take place wherever the person happens to be."). The *Moore* court also noted that the "theoretical and empirical evidence (which overall is inconclusive) is consistent with concluding that a right to carry firearms in public may promote self-defense." *Moore*, 702 F.3d at 942. In sum, both Supreme Court and Seventh Circuit precedent indicate that carrying firearms for self-defense outside the home is a significant Second Amendment right, which the legislative and regulatory enactments at issue here restrict. So far, all factors point toward careful scrutiny of those enactments.

On the other hand, they apply only to FPDCC property, meaning the total area where carrying a concealed firearm is regulated is smaller than the entire state (cf. *Moore*, striking down a state-wide ban on carrying firearms) or even an entire city (cf. *Ezell*, striking down city-wide regulations that effectively prohibited possession of firearms), but still substantial—70,000 acres across the county. Additionally, the regulations allow users of FPDCC property to keep firearms in their locked vehicles in FPDCC parking lots, so the regulations do not prevent lawful concealed carry before or after visiting FPDCC property. The burden that Section 65(a)(14) and Ordinance 3-3-6 impose is more modest than in cases that struck down or applied something akin to strict scrutiny to gun regulations. Thus, the rigor with which the Court reviews Section 65(a)(14) and Ordinance 3-3-6 is significant, but less than *Ezell* and *Moore*. The government must show that the

challenged regulations are substantially related to an important governmental objective with a fairly close fit between the government's ends and its chosen means.

### 2. Means-Ends Analysis

Barring concealed carry by CCL holders across all FPDCC properties is not, under the evidence submitted by the parties, substantially related to the government's interest in protecting Forest Preserve District visitors. The evidence shows high concentrations of visitors on some, but not all, FPDCC sites. It establishes the presence of children and activities aimed at children on some, but not all, FPDCC sites. The evidence also shows very few gun crimes in the FPDCC, no violent crimes by CCL holders, and no crimes or violations by CCL holders other than carrying a concealed weapon in the FPDCC. Finally, Defendants present no evidence that restricting carry by CCL holders will prevent crime or protect Forest Preserve District visitors. Thus, the record does not show that the blanket prohibition on concealed carry by CCL holders on FPDCC property is sufficiently related to the government's interest in public safety to pass constitutional muster.

### a. The Government's Interest

In applying the Seventh Circuit's means-end test, the Court begins with the end, the governmental interest to which the regulation must bear a substantial relationship. The government's interest in this case is protecting people in recreational areas, especially children, from gun violence. [103 at 12], citing *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 419 (7th Cir. 2015). Public safety is unquestionably a strong governmental interest. See *United States v. Salerno*, 481 U.S. 739, 755 (1987); *United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power ... than the suppression of violent crime..."); *Ezell II*, 846 F.3d at 895 ("preventing crime" is an "important public concern[ ]").

39

To explain the extent of the government's interest, Defendants present data on the visitors to FPDCC property, especially children. The FPDCC receives approximately 62 million visitors annually [94 at 3], with many facilities and activities aimed at children, including nature centers, youth athletic leagues, campgrounds, Ecological Stewardship Program, the Mighty Acorns Program, and the Citizen Scientists program. The Forest Preserve District also hosts educational programming by other organizations, volunteer events, and permitted activities such as picnics, all of which have minors in attendance.

For the most part, Defendants present aggregate data about types of visitors (youth vs. adult), types of locations, and types of activities. This information is not broken down geographically. For example, the Court knows that in 2017 and 2018, there were roughly 30 athletic leagues with permission to use FPDCC property and that each athletic event ranged in attendance from 20 to 100 people, but the record does not state where those athletic events occurred, or whether they all happened on the same few FPDCC sites or whether they were spread more evenly across its 70,000 acres.

Defendants do provide site-specific data for two large locations: the Chicago Botanic Garden and the Brookfield Zoo. [94 at 4.] The Botanic Garden, for its part, hosted over one million visitors in 2018, including 25,000 students through guided field trips. [94 at 4.] Brookfield Zoo's data is even more granular, but of questionable applicability. A subsection of the concealed carry statute that is not at issue here, 430 ILCS 66/65(a)(21), prohibits concealed carry of firearms in zoos. As a result, it may not matter that Brookfield Zoo is part of the FPDCC, because carrying a firearm on its grounds is prohibited independent of Section 65(a)(14.). But even setting that location aside, the government's interest in public safety is strong, and its particular hook for

applying that interest to the FPDCC—the presence of children—is well-established for some areas of the FPDCC, but the record is uncertain or weak as to the entirety of the FPDCC.

### b. Assessing the Relationship Between the Means and the Ends

Next, the government must show a substantial relationship between the regulations and its interest in public safety, with a fairly close fit (though a perfect fit is not required). Specifically, it must show a substantial relationship between prohibiting CCL holders from carrying firearms in the FPDCC and the safety of visitors, especially children. The record, however, shows no relationship between CCL holders and threats to public safety, and no evidence that the regulations reduce crime or prevent injuries or death.

Almost none of the data in the record concerns CCL holders, or if it does, the parties have not disaggregated CCL holders from non-CCL holders. Defendants rely heavily on crime statistics from Cook County and the City of Chicago, but amidst all the violent crimes that the record lists and that Defendants argue show a threat to public safety, no one identifies any violent crimes committed by CCL holders. Turning to the FPDCC in particular, of all the crimes committed in the Forest Preserve between 2014 and 2019, only 4 were committed by CCL holders, [94 at ¶ 63], and those were all violations of Section 65(a)(14)—the crimes committed by CCL holders were only unlawful concealed carry, not murder, assault, armed robbery, or other violent crimes. Similarly, the record shows between 2011 and 2018, a mere 14 violations of Ordinance 3-3-6.[19] [94 at ¶ 55(e)]. The record does not contain evidence that CCL holders committed other crimes in or out of the FPDCC, which makes the link between regulating their conduct and public safety tenuous. Nor does the record contain evidence that prohibiting CCL holders from carrying firearms in the FPDCC will otherwise reduce crime, prevent injury, or save lives.

---

[19] The Court assumes these violations were by CCL holders, though the parties do not specify.

A recent case illustrates the problems that this gap in the evidence causes for Defendants. In *Kole v. Vill. of Norridge*, the court analyzed a village ordinance that prohibited gun stores from operating within one thousand feet of the property boundary of any: a) public or private nursery, elementary, or secondary school; b) childcare facility; c) government building; d) public park, playground, playing field, forest preserve, or other recreational area; or (e) place of religious worship, which left only 0.76% of the total Village land area available to locate a gun store. 2017 WL 5128989, at *4 (N.D. Ill. Nov. 6, 2017).  Applying a burden higher than intermediate scrutiny, the court found that the Village had done little to show the "close fit" between its interest in public safety and the ordinance at issue, because it cited no data or expert opinion regarding the impact of the types of restrictions imposed on firearm sales and acquisition on crime rates and public safety. *Id.* at *13–14.  As a result, "the Village ha[d] not established the required means-end fit between the challenged regulations and its justifications." *Id.* at *14.

Similarly, Defendants here offered no evidence connecting concealed carry by CCL holders to any threat to public safety, much less a threat within the regulated area, the FPDCC. Though their burden is lower than that of the defendant in *Kole*, and expert testimony is not a requirement for upholding the constitutionality of a firearm regulation, they face the same kind of problem: Defendants had to provide *some* link between the regulated activity and their interest in public safety, but that link is not in the record.

The one place Defendants do address public safety and carry by CCL holders in particular is a pair of footnotes in the County Defendants' memorandum in support of their cross-motion for summary judgment. [106 at 16-17 n. 8, 9.]  These two footnotes cite a few academic articles on public carrying of firearms and licensed concealed carry, but it is not clear what, if anything, the Court can do with this evidence, because it does not appear to be properly part of the record.  None

of the articles, or propositions that Defendants cite them for, are included in the joint statement of undisputed facts [94], nor are they "generally known" or able to be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned" such that the Court could take judicial notice of them.

The remainder of the public-safety-oriented evidence is worth a brief discussion. First, evidence of criminal activity in Cook County and Chicago generally is related only loosely, if at all, to the Forest Preserve District. Chicago crimes are unhelpful because only 5% of FPDCC land is within Chicago city limits[20] and Defendants do not explain why they dangers of urban gun violence should be attributed to forest preserves. The same is true for crime in Cook County generally. Defendants' crime statistics are geographically disconnected from the places regulated by Section 65(a)(14) and Ordinance 3-3-6, with no explanation for why they should apply to the Forest Preserve, so they do little to establish dangers for public safety inside the Forest Preserve that could be ameliorated by barring CCL holders from carrying firearms in the Forest Preserve.

The Court also notes that several pieces of data appear irrelevant to the statute and ordinance at issue—for example, three of the six categories of ordinance violations that Defendants offer statistics for have no apparent connection to this case: "Hunting devices," "Carry knife, switchblade, ballistic knife," and "Discharging toy firearms," none of which appear to involve carrying concealed handguns, the activity regulated by Section 65(a)(14) and Ordinance 3-3-6—so the Court will not discuss them any further.

A final point on crime and threats to public safety worth noting is the relatively low rate of crime in the Forest Preserve District. In 2018 there were fifteen incidents of major crimes (such as robbery, assault, and sexual assault) in the FPDCC, of which only three involved a weapon. [94

---

[20] 3,538 out of 70,000 acres. [94. at ¶¶ 8, 10.]

at 12; 95-7 at 4.]  The parties do not say whether the weapons were concealed handguns or whether any of the perpetrators were CCL holders.  It is hard to tell which way this data cuts.  Defendants say that the low level of crime is evidence that the regulations achieve their goal.  Plaintiff points to the even lower number of crimes in forest preserve districts in neighboring counties, which allow licensed concealed carry, and says this is evidence that concealed carry reduces crime.  Both sides make arguments based on *correlation* between crime and the presence or absence of concealed carry, but neither presents evidence of *causation*.  The Court can do little with these facts except note the disagreement in how to interpret them and move on, as neither suggested inference is very well supported.

### c.  Concluding the Means-Ends Test

Ultimately, the government has established a high number of visitors to some, but not all, FPDCC sites, and the presence of children on some, but not all, FPDCC sites, and the record contains little information on the concentration or spread of visitors across the range of FPDCC properties or types of property (aside from the Botanic Garden).  That is a shaky foundation for a regulation that applies to all of the Forest Preserve District.  Furthermore, the government has shown little threat to public safety in the FPDCC, and even less involving concealed firearms, and none by CCL holders.  Nor has the government provided evidence that the current low threat of gun violence in the FPDCC is a result of Section 65(a)(14) and Ordinance 3-3-6.  Both restrictions regulate people whom and behavior that the government has not demonstrated pose such a danger to public safety that a ban on otherwise lawful concealed carry is justified through the entirety of the Forest Preserve District.  Based on the evidence in the record, Section 65(a)(14) and Ordinance 3-3-6 are not substantially related to the interest that the government identified.

This is not to say that the government necessarily must justify such a restriction on a site-by-site basis. See *Kanter*, 919 F.3d at 450 (rejecting plaintiff's suggestion that ban on felons possessing firearms should be based on "highly-individualized" determinations rather than categories of convictions because it raised "serious institutional and administrative concerns"). It may be able to do so for categories of sites or activities, such as—hypothetically—nature centers or athletic facilities. Nor are Defendants persuasive in their argument that it would be impossible or unworkable for them to identify places within the Forest Preserve where children are present, perhaps even in a way that would qualify as a "sensitive place" under *Heller*. Contrary to their response briefs, nothing in the caselaw suggests that they would have to write regulations that vary by time of day or that apply only when children are present; school zone laws without such variance have been upheld despite children not being physically on school grounds twenty-four hours per day, seven days per week, three hundred and sixty-five days per year. In fact, the Illinois General Assembly has already made these kinds of distinctions. For example, 430 ILCS 66/65 picks out schools (Section (65)(a)(1)), government buildings (Section (65)(a)(5)), athletic areas and facilities (Section (65)(a)(11)), amusement parks (Section (65)(a)(21) and other such locations for restrictions of concealed carry. That is not to say that these regulations are or are not constitutional, or that they do or do not apply to areas within the FPDCC. Rather, the Court merely notes that Defendants' evidence in this case is concentrated on areas like these, and that the government's interest in public safety is heightened in areas like these, and that the General Assembly is capable of identifying and writing legislation for areas like these.

Accepting that Section 65(a)(14) is unconstitutional as written does not resolve all questions about whether or how to regulate concealed carry of firearms in different places in the FPDCC going forward, and, even if the Court had the authority to answer those questions, it could

not do so with the information currently before it. More fundamentally, those are judgments best left to the legislature, and the legislature ought to have an opportunity to make those judgments. Therefore, the Court temporarily stays enforcement of its ruling for a period of six months—*i.e.*, until March 15, 2022—to provide the General Assembly an opportunity to act on this matter if it chooses to do so. See *Moore*, 702 F.3d at 942 (finding firearm regulation unconstitutional but staying its order to allow the Illinois legislature to craft a new law consistent with the Second Amendment); *Anheuser-Busch, Inc. v. Schnorf*, 738 F. Supp. 2d 793, 816-17 (N.D. Ill. 2010) (staying enforcement of ruling "to provide the Illinois General Assembly with an opportunity to act on this matter if it so chooses"); *Population Servs. Int'l v. Wilson,* 398 F. Supp. 321, 340–41 (S.D.N.Y. 1975) (staying enforcement of injunction for a period of time to permit state legislature the opportunity to amend unconstitutional statutes).

### D.    Due Process and Equal Protection

Plaintiff also asserts claims under the Due Process and the Equal Protection Clauses of the Fourteenth Amendment. Defendants argue that both claims must fail, and they are correct. The Seventh Circuit recently rejected due process and equal protection claims to an Illinois firearms regulation because neither the plaintiffs in that case, nor the Seventh Circuit independently, had "identified any precedent (from the Supreme Court or otherwise) recognizing that either the Equal Protection or Due Process Clause confers a substantive right to engage in the public carry of a firearm." *Culp v. Raoul*, 921 F.3d 646, 658 (7th Cir. 2019), *cert. denied*, 141 S. Ct. 109, 207 L. Ed. 2d 1051 (2020). As this Court has noted before, "the Supreme Court has held that where another Amendment 'provides an explicit textual source of constitutional protection against [the alleged] source of physically intrusive government conduct, that Amendment, not the more

generalized notion of 'substantive due process,'[21] must be the guide for analyzing [the] claims." *Second Amend. Arms v. City of Chicago*, 135 F. Supp. 3d 743, 763 (N.D. Ill. 2015) (citing *Graham v. Connor,* 490 U.S. 386, 395 (1989) (dismissing due process challenge because plaintiff was required to pursue claim regarding right to sell firearms under the Second Amendment). The same is true for equal protection claims. *Culp*, 921 F.3d at 658 ("repackaging a claim that is more appropriately brought under a different constitutional provision—here the Second Amendment— as an equal protection claim will not usurp the settled legal framework that has traditionally applied"). Plaintiff's claims are for infringement of his right to bear arms, which is governed by the Second Amendment. Therefore, he may pursue his claims under the Second Amendment, but not the Due Process Clause or the Equal Protection Clause, and Defendants' motions for summary judgment are granted as to Counts II and III.[22]

Plaintiff offers no specific response to Defendants' arguments but does say that his right to use public property, separate from his right to bear arms, is at issue. [108 at 20; 109 at 21]. The sole case he cites in support, *Greensboro v. Simkins*, 246 F.2d 425, 426 (4th Cir. 1957), confirms the right to "use public property without discrimination on the ground of race," and Plaintiff, who brings no claims of racial discrimination, does not explain what that right or *Greensboro* has to do with the regulations at issue in this case. Moreover, Defendants correctly point out that Plaintiff

---

[21] The Court does not understand Plaintiff to be bringing any procedural due process claims. The complaint does not suggest that he is, County Defendants point out that Plaintiff has not identified any procedural safeguard that the regulations at issue deprived him of, see [106 at 23, n.10], and Plaintiff's response briefs do nothing to challenge that view.

[22] The County Defendants also argued that Plaintiff asserted no due process claims against them, because the complaint alleges only that the state law, 430 ILCS 66/65(a)(14)—not Ordinance 3-6-6—violates the Due Process and Equal Protection clauses. [106 at 22.] As a result, the County Defendants say, Plaintiff failed to provide required notice of such claims against the County Defendants and should not be allowed to amend the complaint via his summary judgment briefing. [*Id.*] (citing *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002); see also *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012). Because Plaintiff's due process claim fails on the merits anyway, as does his equal protection claim, the Court need not decide the issue of notice that Defendants raise.

is and has been free to enter and use the FPDCC, as long as he does not possess a firearm on his person while inside its borders and outside of his vehicle. [103 at 15 n.7.]  Thus, his right to use public property remains unimpeded by the regulations at issue here.  What is at stake is his right to carry a firearm on FPDCC property, which is protected by, and must be analyzed under, the Second Amendment.

## IV.    Conclusion

For the reasons explained above, the Court grants in part and denies in part Plaintiff's motion for summary judgment [100] and grants in part and denies in part the cross-motions of the County Defendants [105] and Intervenor-Defendant [103].   Specifically, Plaintiff's motion is granted as to Count I and denied as to Counts II and III, and the cross-motions of the County Defendants [105] and Intervenor-Defendant [103] are denied as to Count I and granted as to Counts II and III.  As a consequence of its ruling in Plaintiff's favor on Count I, the Court finds the firearms regulations at issue to be unconstitutionally overbroad.  Nevertheless, the Court temporarily stays enforcement of its ruling for six months—*i.e.*, until March 15, 2022—to provide the General Assembly an opportunity to act definitively on this matter if it chooses to do so.

Dated: September 13, 2021

_____
Robert M. Dow, Jr.
United States District Judge

48